## F. B. COLLINS INV. CO. v. EASLEY *et al.*

No. 3874. Opinion Filed December 8, 1914.

(144 Pac. 1072.)

1. **MORTGAGES — Validity — "Duress" — "Menace" — Threats by Mortgagee.** A threat by a mortgagee to institute foreclosure proceedings against the homestead and other property of the defendant, unless a mortgage was executed to take up such previous liens, is not such a threat as will constitute "duress" or "menace," as contemplated by sections 1049 and 1050, Comp. Laws 1909 (Rev. Laws 1910, secs. 900 and 901).

2. **CONTRACTS—Duress—Threats to Injure Credit.** Under sections 1049 and 1050 (900 and 901), **supra,** a charge of duress cannot be predicated upon a threat to injure the defendant's credit.

3. **MORTGAGES—Foreclosure—Fraud—Sufficiency of Evidence.** Evidence examined, and **held** to be insufficient to sustain an allegation under subdivision 4 of section 1052, Comp. Laws 1909 (Rev. Laws 1910, sec. 903), that a promise to sell a portion of the land in controversy was made with an intention not to perform it.

(Syllabus by Rittenhouse, C.)

*Error from District Court, Harmon County;*

*Frank Mathews, Judge.*

Action by the F. B. Collins Investment Company against Ada Easley and another. Judgment for defendants, and plaintiff brings error. Reversed and remanded.

*Tisinger, Clay, Robinson & Hamilton,* for plaintiff in error.

*A. M. Stewart,* for defendants in error.

Opinion by RITTENHOUSE, C. Samuel W. Easley was the owner of 320 acres of land in Harmon county, Okla., the homestead being the S. W. ¼ of section 17, and the other tract the S. W. ¼ of section 20, all in township 1 N., of range 24 W. of the Indian meridian, and each tract was incumbered by a separate mortgage. He was also the owner of considerable chattel property, which was mortgaged to the First National Bank in the sum of $400. Subsequent to the execution of these mortgages, he abandoned his wife, Ada Easley, and transferred to her all of the above-mentioned property, which transfers were accepted by Ada Easley and placed of record, she continuing to reside upon the homestead. After the separation the creditors insisted upon an immediate settlement of their claims, and threatened to foreclose the same. On June 7, 1909, J. A. Jarnigan and W. A. Darby, who were agents of the F. B. Collins Investment Company, went to the home of Ada Easley and negotiated a loan for $3,200 on the real estate hereinbefore described, the mortgage of which was signed by Samuel W. Easley and Ada Easley, his wife. In addition to the first mortgage of $3,200, they executed a second mortgage for the purpose of securing the agents' commission. The undisputed evidence shows that all the money derived from the loan of $3,200 was used for the payment of the liens against the two tracts of land and the lien against the chattel property, which were all paid directly to the lienholders by the F. B. Collins Investment Company. The balance remaining to Ada Easley after the payment of such liens amounted to $762.08, which was deposited

by Ada Easley in the First State Bank of Hollis, and which she used in purchasing clothes and paying other obligations. On the 11th day of March, 1911, the F. B. Collins Investment Company instituted foreclosure proceedings on the four commission notes, of $190 each, against the land. On June 30, 1911, Ada Easley filed an answer in said cause, which answer was afterwards amended, setting forth the facts that the notes sued on were commission notes; that the original note was $3,200, which was held by the Great Western Life Insurance Company; that it was a part and parcel of the same transaction; that she was induced to sign such notes by misrepresentation and duress; that the signing of the same was not her free and voluntary act; that the note held by the Great Western Life Insurance Company was a negotiable instrument—and asked that the Great Western Life Insurance Company be made a party to said action, that she have a judgment canceling said notes and mortgages, and especially the mortgage on the homestead, and praying that, if it be found that the Great Western Life Insurance Company was an innocent purchaser, and thereby entitled to a lien against the homestead, that she have judgment against the plaintiff for damages because of the lien so fixed, and that the Great Western Life Insurance Company be made a party to the action. Answer and cross-petition were filed and foreclosure asked by the Great Western Life Insurance Company on the first mortgage of $3,200.

The F. B. Collins Investment Company filed a reply, in which they set forth that the proceeds of said loan had been used in paying off prior mortgages and incumbrances on said property and delinquent taxes thereon, and that the sum of $762.08 was paid directly to Ada Easley, and denying generally the allegations of misrepresentation and duress. Upon the issues thus formed the cause was tried, and resulted in a judgment in favor of the Great Western Life Insurance Company upon the note sued upon, and for foreclosure of its mortgage. The court rendered judgment in favor of the plaintiff, the F. B. Collins Investment Company, for the amount sued for in its petition

against Samuel W. Easley, and for the foreclosure of its mortgage upon the S. W. ¼ of section 20, township 1 N., of range 24 W., and canceled the mortgage upon the homestead; also canceling the commission notes, except in so far as the same were a lien upon the quarter section which was not the homestead. The court found that Ada Easley was induced to sign the notes and mortgages, sued upon in said action, by misrepresentation and duress, and that she was entitled to damages against the plaintiff for the amount of the judgment rendered in favor of the Great Western Life Insurance Company, less the sum paid out by the plaintiff in discharge of the mortgage that was a lien upon the homestead, and less the sum of $762.08 which was paid directly to Ada Easley, and thereupon the court rendered judgment in favor of Ada Easley against the F. B. Collins Investment Company in the sum of $1,753.70 as damages. Motion for a new trial was filed, overruled, and the cause brought here for review.

There is but one question to be decided in this case, and that is: Was there sufficient evidence to justify the court in holding that J. A. Jarnigan and W. A. Darby, agents of the F. B. Collins Investment Company, procured the notes and mortgages by misrepresentation and duress? We have diligently searched the record for evidence which would tend to support these allegations, but have been unable to find any evidence which would justify such a holding. Ada Easley testified:

"Q. Was anything said about your husband's debts? A. That he would give a mortgage on all of my stuff, and that would be taken from me. Q. Who was it given to? A. To the Bank of Eldorado, they said. * * * Q. Did you have any source to get other provisions at the time? A. No. Q. Was anything said about this condition? A. Yes. Q. What was said? A. That as soon as they found out he was gone they would close in and stop my credit. * * * Q. Now, was there any other representations made by Mr. Darby to get you to sign this mortgage? A. They said, if I would sign the mortgage, they would sell that lower place and pay off all my home. They would see that I didn't lose my home. Q. Who said that? A. Darby and Jarnigan both. Q. When did they say

that? A. They said it all three times. Q. What do you mean by the lower place? A. The S. W. ¼ of section 20. Q. About what is your homestead worth? A. About $4,000. Q. About what is the reasonable value of the lower quarter section? A. About $3,000. Q. Well, did you believe they would sell the lower place and pay this off, or not? A. I did. Q. When did they say they would do that, or did they fix any time? A. On or before that fall. Q. Have they ever sold this and paid this off. A. No. Q. Now, Mrs. Easley, you knew that Darby could not compel you to sign these instruments unless you wanted to, didn't you? A. His threats was what the others would do, and told me what condition I was in, and that I had better sign them —that they would make me do it, whether I wanted to or not. Q. Did he tell you that Mr. Pierce could make you sign this mortgage? A. If I didn't do it, that they would stop my credit and take my stock. Q. How were they going to stop your credit? A. They would go and tell them I wasn't willing to pay my debts. They had influence there, while I had none. They would take their word, and not mine. Q. Mr. Darby and Mr. Jarnigan didn't live in Eldorado, did they? A. No; but they had acquaintances there. Q. Mr. Darby wasn't even a resident of that community, was he, or Mr. Jarnigan either? A. I don't know. * * * Q. What kind of a statement did they send? A. I don't know; I think it was by order of S. W. Easley they sent me a check for $700. It was a gift to me, so far as I understood from Mr. Easley. Q. You understood it was the balance of the proceeds of this note for which you had signed the mortgage? A. I don't remember exactly all that they said in that. Q. I am asking you what you understood about it? A. I understood that it was the rest of the proceeds. Q. I mean the rest of the proceeds of that mortgage you had made? A. Yes; I think so, but I didn't—I don't understand how that is really— what do you mean? * * * Q. You understood, though, it was the check of this loan? A. Yes, sir; out of the loan me and Mr. Easley had made. * * * Q. Now, at the time you received this $762.08, this check, and indorsed it, and put it in the bank as a deposit here, you understood that it was the proceeds of the loan for these papers which you had signed while Mr. Jarnigan and Darby were out there the last time? A. I didn't know anything about that mortgage. I didn't understand it. Q. At the time they sent you the check, they wrote you it was the balance of a loan which had been made by Easley and yourself? A. They wrote me that. * * * Q. You understood that at the time you received the check that they were

claiming it was the proceeds out of this loan made by Easley and yourself.   A. Yes, sir; I didn't know what note they referred to, though.   I didn't understand any of the whole business, to tell the truth about it."

The evidence which tends to show duress consists of threats made by Pierce, who was a creditor of Samuel W. Easley and Ada Easley, that he would foreclose his several mortgages unless his claims were paid, and a representation by the agent, Darby, that such mortgages would be foreclosed unless arrangements were made to discharge the same by the execution of the note to F. B. Collins Investment Company, and that the credit of Asa Easley would thereby be injured.   These representations do not constitute legal duress, as contemplated by sections 1049 and 1050, Comp. Laws 1909 (Rev. Laws 1910, secs. 900 and 901), as a threat by a mortgagee of either real or chattel property to enforce his lien by suit does not constitute duress. *Dunham v. Griswold,* 100 N. Y. 224, 3 N. E. 76; *Vick v. Shinn,* 49 Ark. 70, 4 S. W. 60, 4 Am. St. Rep. 26; *Hilborn v. Bucknam,* 78 Me. 482, 7 Atl. 272, 57 Am. Rep. 816; *Claflin v. McDonough,* 33 Mo. 417, 84 Am. Dec. 54; 11 Century, tit. Contracts, sec. 437.

Nor did the threat by Pierce that he would injure her credit constitute legal duress under said section 1049 (900), *supra,* or a menace under section 1050 (901), *supra.*   It is said in 9 Cyc. page 448, that:

"Duress by mere advice, direction, influence and persuasion is not recognized in law.   Nor can a charge of legal duress be predicated upon a threat to injure one's credit, to withhold payment of a debt, to refuse performance of a contract, or to foreclose or exercise the power of sale on a mortgage, a threat of arrest or arrest on civil process on a legal claim, when such arrest is allowed by law, or a threat of, or the bringing of, a lawsuit or civil process.   Nor can a charge of duress be based upon merely speaking wrongly to a woman, without threats of personal violence, mere vexation and annoyance, mere pecuniary distress, or the refusal to surrender property on which one has a lien.   And there is no duress where a man induces his wife to mortgage her separate estate by threatening to withdraw him-

self from her society if she refuses, where a husband threatens that unless his wife signs his note as surety he will poison himself. * * *"

The next question is whether there were misrepresentations or undue influence used in the procurement of these mortgages. There were special interrogatories submitted to the jury, one of which is as follows:

"If you answer the above interrogatory No. 2 in the affirmative, state what threats or misrepresentations were made, and by whom they were made. A. By misrepresentations by J. A. Jarnigan by the sale of the lower quarter to release the homestead of the indebtedness; also by the oppression of premature collection of chattel mortgage made by A. P. Pierce."

And upon this finding the court rendered judgment in favor of the defendant. The answer of Ada Easley alleged that J. A. Jarnigan agreed to assist her in the sale of the lower place. Her evidence was that Jarnigan had represented to her that he would sell the lower quarter to release the homestead of the indebtedness. It is evident that the defendant attempted to bring her defense under subdivision 4 of section 1052, Comp. Laws 1909 (Rev. Laws 1910, sec. 903), on the theory that the F. B. Collins Investment Company, through its agents, had promised to sell the lower quarter to release the homestead of the indebtedness without any intention of performing it. There is a variance between the allegation in the petition and the proof; but, regardless of this variance, there was no evidence that the promise was made with an intention not to perform it.

The uncontradicted evidence establishes the fact that by this transaction Ada Easley became the absolute owner of the land in controversy, which she valued at $7,000; that she also became the owner of considerable chattel property; that her creditors were threatening to foreclose their several liens, and that it became and was necessary to raise money with which to discharge the same, and in order to do so she executed the mortgage, hereinbefore referred to, to F. B. Collins Investment Company; and that all of the funds derived from the mortgage went to pay off liens for which her property was previously

charged, except the sum of $762.08, which she received in cash, and which she used for her own personal obligations.

We therefore conclude that there is not sufficient evidence in the record to support the allegation of misrepresentation and duress, and the judgment should therefore be reversed and remanded, and the trial court ordered to render judgment as prayed for in plaintiff's petition.

By the Court: It is so ordered.